ESSEX COUNTY CIRCUIT COURT.

IN RE APPEAL OF VARIOUS PROPERTY OWNERS TO BENEFIT ASSESSMENTS FOR LOCAL IMPROVEMENTS FOR THE OPENING OF RAYMOND PLAZA WEST, NEWARK.

Decided January 14, 1937.

For the city of Newark, *Vincent J. Casale.*

PORTER, C. C. J.   The city of Newark, through its proper officers, opened a new street, Raymond Plaza West, from

Market to River streets, about seven hundred feet in length and one hundred and twenty-five feet in width.

Its board of assessments for local improvements assessed certain land owners in the vicinity, whose land it found had received special benefits by reason of this street opening, amounting to $216,966. Of this amount objections were made against confirmation by property owners whose assessments aggregated $166,881. This court heard testimony on those objections and under date of March 19th, 1934, returned the report without confirmation for reasons stated in an opinion printed in 12 *N. J. Mis. R.* 303.

The board thereafter made a revised report, which finds special benefits to lands within a much restricted area to that of the original report. The assessments reported amount. in the aggregate to $68,083. Of that amount property owners whose lands have been assessed $42,749 have objected to confirmation and have now been heard.

It appears from the testimony that under date of January 9th, 1929, a written agreement was entered into between the city of Newark, the United New Jersey Railroad and Canal Company, owner, and the Pennsylvania Railroad Company, its lessee, having as its object, among other things, the construction of a new main passenger station at a new location therein designated. The city agreed therein "to provide certain additional area for said new station and the approaches thereto and for the additional tracks and facilities west thereof and to provide adequate street, highway and plaza facilities around said new station in order to improve the surroundings thereof and make more convenient the access thereto, that congestion may be avoided and public safety promoted.

Before this agreement was entered into enabling legislation was obtained. Chapter 145, *Pamph. L.* 1925; *Supp. Comp. Stat.* 1925-1930, *p.* 1504, § 170-30.

The new street was laid out as of July, 1931. The railroad station was built and located on the new street or plaza, as its name implies. It was opened to public use about March, 1935.

It is the contention of the city that the opening of this new street was a local improvement which conferred special

benefit to lands within the following area: those fronting on the new street opposite the railroad station; land on Raymond Boulevard, Commerce street and on the northerly side of Market street westerly from the new street to within a short distance of Mulberry street; land on the southerly side of Market street facing the new street; land on River street northerly from the new street to Cherry street, and land on the westerly side of McCarter Highway between Market and Commerce streets.

The conclusion of the board was that the land within this area had benefited specially by increase in market value, a certain scale of amounts per front foot was adopted based upon the location of the land, &c. The method used is not attacked.

However, the objectors contend that no special benefits whatever have accrued to their lands.

A sharp conflict in the testimony exists on this factual question.

The objectors also contend that the assessments are not warranted under the law because this improvement is not a local one but is a railroad improvement and so general.

It is the contention of the city that this court has power only to decide whether or not the assessments were inherently improper, unfair, irrational, or arrived at by the use of improper methods.

An examination of the statute, however, seems to give the court much broader power. *Pamph. L.* 1925, *ch.* 72; *Supp. Comp. Stat.* 1925-1930, *pp.* 1137, 1140, §§ *136-2062 et seq.* Section 3, page 1139, section *136-2064 provides that the court shall hear *"any* objection that may be made to such assessment and after hearing *any matter* which may be alleged against the same, the court shall by rule or order either confirm the said report, or refer the same to the said officer or board for revision or correction * * *."

Judge Adams, in *In re Branford Place, Newark, opening,* decided March 23d, 1916, and not reported, found that an assessment on the lands of St. Paul's Episcopal Church, located at the corner of High and Market streets, were unlawful under the proofs and so returned that assessment for

revision or correction, really for cancellation, as a matter of law. It was found that under the terms of the deed to the church the use of the property was restricted to religious purposes. Increased market value, therefore, brought no special benefit. To sustain the assessment it would have to be shown that there was an increase in value of the use for religious purposes, which was not established.

The authority of the court in that case was under the provisions of the charter of the city. It provided for confirmation by the court "as right and justice shall require." That language does not seem to be any broader or more inclusive than the statute governing the case *sub judice,* which says that the court may hear "any matter which may be alleged against the same." Surely, if given power to hear any matter it follows that action may be predicated thereon.

Judge Dungan, in the matter of paving of Fourteenth avenue, Irvington, in 1924, in an unreported decision, held that lands of a cemetery association were exempt from assessment and that the assessment was, therefore, unlawful.

An appeal in that case was taken to the Supreme Court and resulted in an affirmance, 3 *N. J. Mis. R.* 102; 127 *Atl. Rep.* 523. The Court of Errors and Appeals also affirmed, 102 *N. J. L.* 440; 131 *Atl. Rep.* 923.

The city argues that a question of law such as in the Irvington case could only be raised on *certiorari* and that the Circuit Court was, therefore, without power. Apparently that point was not raised, because neither the Supreme Court nor the Court of Errors and Appeals opinions refer to it. But even though not raised by counsel it cannot be assumed that both appellate courts would have overlooked so important a question.

*Certiorari* is, of course, the method to be used to attack an ordinance if any illegality existed in its passage or otherwise, but the objectors here make no such claim. They do not attack the ordinance, but, rather, do attack what they claim is an unlawful assessment made thereunder.

This court has concluded that they may do so.

The objectors, in their contention that this improvement is not a local one, point out that it was not a needed thorough-

fare, nor was it intended to care for the existing ordinary traffic because streets were in existence near this location (which have been vacated) and which were amply sufficient and suitable for the public need. They contend that the new street was created for a special purpose and use; to provide a plaza for the railroad station and for the use of traffic to and from the station.

The court concurs with that view.

The agreement with the railroad company was made under authority of chapter 145, *Pamph. L.* 1925; *Supp. Comp. Stat.* 1925-1930, *p.* 1504, § 170-30. This is an amendment to section 30 of the General Railroad act of 1903. Section 30 of that act, before amendment, authorized municipalities to lay out, open and vacate streets to facilitate operation of railroads without including station improvements.

In chapter 58, *Pamph. L.* 1915; 2 *Cum. Supp. Comp. Stat., p.* 2210, § *136-2090A(1), this section was amended to permit municipalities to lay out, improve and maintain parks adjacent to railroad stations. The cost of such improvements to be borne by the municipality and railroad company as provided by agreements between them.

At the same time another act was adopted, chapter 58, *Pamph. L.* 1915; 2 *Cum. Supp. Comp. Stat.* 1911-1924, *p.* 2210, § *136-2090A (1), giving authority to the municipality to raise its share of the cost of the improvement by levy of a general tax or the issuance of bonds.

Just those two methods of raising funds are authorized. The legislative intent seems clearly to have considered such improvements as general, else it would not have provided for the raising of funds by a general bond issue or general tax levy. It excluded raising any part of the cost by assessing any property which might be specially benefited.

The 1925 amendment aforesaid reads as follows:

"In any municipality it shall be lawful for the proper municipal authorities to enter into such contracts with any railroad company or companies whose roads may lie wholly or partially within the municpality or whose route has been located therein as will secure greater safety to persons or property therein, or will facilitate the construction therein

or maintenance of other than grade crossings of streets, highways, or other railroads, or will *provide* for *increased* or *improved station* or terminal *facilities* and *transportation service,* or will *improve* the *surroundings* of or *make more convenient* the *access* to a *station* or stations of such railroad within such municipality, and *for such purposes* the municipal authorities may construct sidewalks on, repave, curb, gutter, lay out, open, vacate, or alter the lines and change the grade of any streets, highways, squares or other public areas or places, and may *lay out,* improve and maintain public parks, *plazas, or other public places, as a part of such improvements,* and the railroad company may locate, relocate, change, alter grades of, depress or elevate any of its railroad tracks, bridges or facilities, and construct new or additional tracks and transportation or station facilities as shall be specified and provided for in such contract, and for the purposes of this act such municipality and such railroad company may take by purchase or condemnation any lands required for such improvements, and make such changes or conveyances of their respective lands or any interest therein as will facilitate said work and the cost and expenses of any such lands, changes and improvements shall be borne by such municipality and such railroad company in such shares or proportions as may be provided in said contract."

As before noted, the agreement under which these improvements were made was made in pursuance with that statute. Hence it is inescapable that this new street is, in fact, a station improvement, a public place true, but none the less a necessary and integral part of the station created for that avowed and necessary purpose and use.

The cost must, therefore, under the law, be borne by the public generally, either by a general tax levy or a bond issue.

This improvement being defined as a general one cannot, of course, be financed wholly or in part by assessments against land of the objectors even though benefited.

A local improvement, under article 20, section 1, of Home Rule act (2 *Cum. Supp. Comp. Stat.* 1911-1924, *p.* 2194, § *136-2001), does not embrace streets which are laid out for an approach or plaza to a railroad station.

The power of this court is limited to the confirmation of assessments for local improvements; this being a general improvement, cannot be confirmed.

Whether or not this review of the various legal questions which were presented requires consideration of the factual question as to whether or not the lands were benefited the court deems it advisable, nevertheless, to state its views. A number of witnesses were examined and a great deal of testimony given. Eleven court days were required in the proceedings. It consisted largely of opinion testimony given by well-recognized experts.

A most careful consideration has been given to this testimony. It has been weighed in the light of the reasons given as the basis for the conclusions arrived at as well as the knowledge and peculiar experience of the witnesses. It appears that the board in its first study prior to the making of its first report did not have the benefit of any experts on behalf of the city.

On its revised and corrected report, however, the city produced the testimony of two such experts, both of whom testified before this court. The three experts for the objectors, who testified here, also appeared before the board.

In addition there testified here one property owner, who also has expert knowledge because of his long years of residence and experience with property in this immediate vicinity.

Two members of the board and its clerk also testified, as did other officials re some technical matters, maps, &c.

It is extremely difficult, if not impossible, to know or with any degree of accuracy to estimate special benefits to land in a locality where several improvements or major changes have occurred at or about the same time and to allocate those benefits among the several improvements. Such was the situation here.

A process of evolution of that entire locality has been in progress for the past few years. First came the building of the new Center Market and the removal of many families residing in the buildings which had to be demolished. Later many more buildings were razed for the establishment of the open market plaza to the east of the market. Then came

the abandonment of the Morris canal, which ran directly through the heart of this section, and later the building of the railroad in the bed of the canal and the new highway on the surface—Raymond Boulevard. Commerce street for many years was almost entirely occupied by produce commission merchants. Two new centers were established for that business and nearly all of the merchants moved to either one or the other. Those remaining and now there, are the least important from the financial responsibility standpoint and, therefore, as desirable and permanent tenants. Another recent improvement was the establishment of a new highway from north to south through the heart of this section called the McCarter highway. Mulberry street just outside of this area was widened and improved. And finally came the great railroad changes, the building of a new railroad station by the Pennsylvania Railroad Company, the rerouting of local traffic by means of the new city subway on the canal bed and the proposed removal of the Hudson and Manhattan terminal at Park Place to the Pennsylvania Railroad station.

All of these major improvements, except the Center Market and market plaza, were accomplished within a short time of each other, many of them being a part of a general plan.

Doubtless each one of these improvements affected the values and usability of various properties either when made or in the immediate future.

Having in mind all of these changes vitally affecting this locality, how is it possible for any one to say what effect the opening of Raymond Plaza west alone and unrelated to any other factor has or may have in the immediate future on the value of the adjacent land? Some of these changes may increase values and some the reverse. The removal of the commission merchants and the failure of the owners to obtain tenants for those properties in Commerce street, most of which are still vacant in the lower part of the street, certainly did not enhance values there. The abandonment of the market was a detriment, also. Changes will naturally follow in any material change in the flow of vehicular and pedestrian traffic, some locations being helped and others hindered.

Another important factor which must not be lost sight of is the general stagnation of the real estate market both as to sales and rentals due to the economic depression covering the years from 1929 to the present.

There have been no sales within this area since this improvement which help in the establishment of values. Rentals have also been so few and under such conditions as to be of little or no assistance, nor have buildings been built or altered to any appreciable extent. The fact that practically no sales, building or changes have been made in the properties in question during the five and a half years which have elapsed since this improvement was made is an important factor to be considered. If the opening of the street has increased values by creating a new and higher use for the property, why has it not already borne that fruit? The argument that the owners are short sighted and are willfully allowing the properties to remain untenanted and unimproved for some ulterior purpose over this period of years is illogical, unsound and without merit. On the contrary the evidence speaks of many efforts made for the utilization of the properties generally with little success.

Both experts for the city, Michael A. Stavitsky and John J. Berry, are of the opinion that the new street has specially benefited the properties of the objectors. The former gives increases in the fifteen properties considered aggregating $52,622, while Mr. Berry's totals come to $59,306. The assessments on these pieces aggregate the sum of $41,275. On the testimony of these experts the board was, of course, justified in its assessments. In these calculations the property of Marzano State Bank and Trust Company, at 313 Market street, was omitted because of the uncertainty as to whether or not it had withdrawn its objection.

The board found that the reasons for the special benefits were two-fold: first, the "toning up" of the area by the tearing down of old and undesirable buildings and the elimination of an undesirable lodging house; the elimination of a slum area, and, second, the increase of traffic which would pass the various properties by reason of this new street. Higher uses, it thought, would be created for the land, retail stores

of higher class than formerly there, hotels, department stores, restaurants, offices, perhaps later two or three-room apartment houses and, also, perhaps later a sport arena.

Both Mr. Stavitsky and Mr. Berry testified that each one of the major improvements above mentioned had been factors in influencing the values of the property in this area. Neither attempted to say what effect each may have had in values or in percentage of values. Both gave consideration to this matter by using a lesser percentage of decrease in values due to the depression than would have been used had these other improvements not been made. For instance, both found their base values as of a time before the depression and reached present day values by deducting a certain percentage thereof because of "depression factor." They also testified, as indeed did the two board members, that the benefits had accrued at the time of the opening of the new street or in the reasonably near future. It developed, however, that Mr. Stavitsky considered the reasonably near future to be from five to ten years. Mr. Berry based his testimony on the same theory, except to define the same as from seven to ten years of normal times, excluding the period of the economic depression.

The board adopted the rule that reasonably near future was from five to seven years and based its findings thereon.

The new street was opened in July, 1931, and the assessments were made as of that time. All of the testimony was likewise directed to that date.

This five to seven-year method adopted by the board was improper. It is speculative and uncertain. The benefits must be present and immediately accruing. *Kellogg* v. *Elizabeth,* 40 *N. J. L.* 274; *Barkman* y. *Hackensack,* 114 *Id.* 506; 177 *Atl. Rep.* 663; *In re Draining Pequest River,* 39 *N. J. L.* 433; *Morris* v. *Bayonne,* 53 *Id.* 299; 21 *Atl. Rep.* 453.

Dr. Charles F. Kraemer, Edward J. Maier and Theodore W. Lemassena, experts for the objectors, all testified that in their opinions there had been no benefits to any of the properties by reason of the new street; that eventually there might be because of the new station, but even that had not yet become manifest even though the station had been in use nearly two years; that while values on the land on the new

street had increased by reason of the new street frontage other factors of a detrimental nature had wiped out such increases.

The factor of toning up seems to have been improperly used. As the term was used by the various witnesses it meant the toning up produced by the tearing down and changing the character of the area from all of the various improvements above set forth. Certainly this must be so because the old buildings torn down on the area covered by Raymond Plaza west alone was a very small part as compared with what was removed on the site of the railroad station, McCarter Highway, Market Plaza and Raymond Boulevard. This factor played an important part in the judgment of the board. Commissioner Yeomans did not give the percentage of toning up and traffic at this hearing, but at the previous hearing said that he considered the proportion of the two factors to be ninety-five per cent. for toning up and five per cent. for traffic. Perhaps, however, he has modified his views meanwhile. Commissioner Rasnik was not a member of the board at the time of the original assessment. His testimony was that the board considered the two factors in the proportion of seventy-five per cent. for toning up and twenty-five per cent. for traffic. Mr. Stavitsky's expressed opinion was that each factor was equal. Mr. Berry gave no proportion in percentage figures, but did say that the increased pedestrian traffic was the most important factor.

Now as to traffic changes. All of the witnesses for the city consider the increase in traffic as a result of the new location of the railroad station. They speak of the number of people who are now going to and from the station and how many more will do so after the Hudson and Manhattan Railroad Company moves its station to that of the Pennsylvania Railroad. The claim is that the vast number of people who will use this approach to the station, especially pedestrian traffic, will give higher uses to the property assessed and enhance its value. In other words, it is argued that the traffic is there and is diffused throughout the assessed area via Raymond Plaza West. Hence the opening of Raymond Plaza West has resulted in the peculiar and special benefits. That argument is unsound. What the board has really done is to

assess for the new railroad station and not for the new street. The station, in fact, was not opened for public use until March, 1935, nearly four years after the opening of the street and time of this assessment. No increased traffic existed during those nearly four years. This again illustrates the point heretofore made that the street was created because of necessity for a plaza or approach to the station and only incidentally, if at all, for any other purpose or need.

The established rule in this state is understood to be that while the preponderance of proof is not enough to set aside an assessment and that the judgment of the board is to be accepted as accurate, it cannot be accepted if the proofs are clear and convincing that the judgment be erroneous, unreasonable, unjust or arrived at by the disregard of some rule of law.

For the reasons stated the court has concluded that the proofs are clear and convincing that the judgment of the board was erroneous, unreasonable and unjust.

The report is returned for further revision and correction without confirmation.